Here ye, here ye, Ms. Honorable Peppercorn for the 2nd Judicial District is now back in session. The Honorable Anne B. Jordanson presiding. Good morning, and please be seated. Your Honor, the second case on the docket this morning is 2-14-0419, where nine people of the state of Illinois claim to actually be Perry v. King's defendants of felony. Arguing for the attempt is Yasmin M. Zuboff. Arguing for the allegation is Blake M. Cunningham. Good morning to you both. Are you both ready to proceed? Okay, counsel, I note that both counsel are wearing masks. When you approach the microphone, please just take it off. Otherwise, we will not be able to understand your arguments. Thank you. Good morning, Your Honors. May it please the Court. Good morning, counsel. My name is Yasmin Nebai, and I represent Perry v. King. I'm happy to answer any questions Your Honors may have today on the various issues in the brief. But for time purposes, I'd like to focus on issues 2 and 3 and potentially touch on issue 4, if I may, if time permits. And the reason being is that there's a common thread that weaves all three together. The prosecution's witnesses in this case were unable to make an identification of the shooters because the shooting happened so quickly and because the drive-by shooter's car had tinted windows. To connect Perry on to this offense, the prosecution relied primarily on connecting him to the shooter's blue car. In all, the State presented evidence of three or four separate cars, none of which they definitively linked together. A car seen 50 minutes before the shooting by two individuals, including a heroin addict, the license plate of that car was provided, but it was never linked to anyone, much less Perry on or Luther Thomas, whom the prosecution maintained sold the shooter's car to Perry on five months earlier. And that gets me to the second car they produced, the car that Luther Thomas allegedly sold Perry on five months earlier. He claimed that he sold that car, but it was still in his name. And in fact, he never provided the license plate of that car or its VIN number. VIN number was never provided either, so that they could be a cross-reference. Finally, there was the shooter's car, which was depicted in a blurry photographic exhibit that revealed neither the car's license plate number or its make and model. And finally, finally, one last car they produced was the car that they located the day after the offense. No physical evidence was recovered on this car, and even though its VIN number was obtained, the jury was never provided with that information. In the absence of concrete proof linking these cars together to prove that they were, in fact, Perry on's car, the prosecution relied... Based upon all of that, all of the testimony you just talked about about this car, and I think on several occasions the letter Q was referenced as part of the plate. So that is all circumstantial evidence. Could the jury not make a reasonable inference based upon that testimony that this, in fact, was the car that the defendant was driving that night? And if not, why not? Your Honor, you are correct. It was the only piece of evidence that we have is the letter Q. That is the only thing. Unfortunately, as I indicated, there are three or four separate cars. And, in fact, there's a reasonable doubt argument, but I'm not arguing that today. Mr. King would take the position that there is, this isn't a reasonable inference. They simply did not connect this car. I mean, the letter Q is a common, it could be one of many letters or the first letter, they said, of this license plate. But we have lots of problems. They say that Luther Thomas sold this car to Perry on. He never provides the license plate of the car he allegedly sold to Perry on so that a cross-reference could be made. But didn't he tell him that he was going to, that he had burned it? No. Actually, he eventually said he was going to burn it. Where did they find the car the next day? They, I'm not, actually, I'm not certain. It might have been nearby. That's not clear. I don't recall from the record. What condition was the car in when they found it? It was completely burned, Your Honor. So isn't that a reasonable inference that the jurors can make? If, but for the improper evidence, see, that's the problem here. We have the prosecution misstating the evidence in closing argument, relying on inadmissible hearsay repeatedly. Was it hearsay or was it to show the sequence of events of this investigation? No. There was, there's two separate statements, Your Honor. There is one made by Tyrone Smith, allegedly, prior to PKMM. That is introduced substantively for the truth, for its truth, as an excited utterance. It is not an excited utterance under case law. The second statement, and I'll elaborate on that. The second statement, Your Honor, is speaking about, it's the statement that Arlen Foss makes about the, the, the news program that he watches, which, allegedly, the license plate that he documents, which the prosecution never linked to anyone, neither Luther nor Perrion, but nonetheless, that that, that that matched the car that the police located. And there was no, with respect to that second statement, there's no limiting instruction telling the jury. The prosecution relies heavily on a case called Bates. And in that case, there was a limiting instruction. There is no limiting instruction. As proof that the court, that this isn't being used for a limited purpose, the prosecution itself throughout, or the State, in its brief, relies on that very statement in arguing that there's no reasonable doubt of guilt and that the evidence is overwhelming. But Smith, he, he said there were others in the vehicle. He said there wasn't Lily, but he never mentioned anybody else, did he? Tyrone, actually, if I may, and that kind of touches on severance, if I, if I could. He taught, when he's initially approached by the police on this matter, he indicates that he didn't see anything. And in fact, when he testifies at trial, that he says the shooting happened so quickly, the shooter's car had tinted windows, and I could only see hands emerging, and I couldn't identify the shooter's race or identity. So those, the very initial statement and the testimony at trial are consistent. However, he comes back after a shoot, being involved in a shootout with police in St. Louis, and then says, then speculates, we will, that, in fact, that car belonged to Perrion King, his rival, someone who he'd been having difficulties with. And so.    And so, you know, the jury, you know, the jury isn't the only one that's involved, but the jury learned all this and made a credibility determination, presumably, as it relates to who they wanted to believe. Your Honor, they did. But we would posit that the improper evidence that comes in through the denial, the improper denial of severance, and through the repetition of the out-of-court statements identifying P.K. and them, that these errors could have shifted the burden. This is a weak case. In this milieu, any error could have tipped the balance and could have led. And, in fact, the jury did deliberate for two days. And they even asked if jurors were coached, which is compelling evidence that they were grappling with this verdict. Returning back to the statement, the hearsay statement, P.K. and them, it is made shortly after the offense, allegedly in response to a question. And the circumstances surrounding that, including, in fact, Tyrone's own motives to lie, the circumstances under which that he fesses up about that statement, and the fact that he, frankly, he doesn't identify anybody. No, he doesn't. In the very beginning. It is more like a speculative statement than a present-sense impression. And it's important to remember that bringing in an out-of-court statement like this, the tipping point. But how does it prejudice your client? Your Honor, because it was repeated so many times. And, in fact. That one statement wasn't repeated so many times. I mean, you talk about the severance. And, you know, in severance you have to show that there's antagonistic defenses. Are you getting the antagonistic defenses confused with cumulative? No. No, Your Honor. Because they are cumulative. But if they're properly admitted and they're cumulative, I mean, what is the detriment to your client other than there's too many witnesses against it? I would direct this Court, actually, to the Rodriguez decision, which very, very nicely, this Court's decision. I might add that the prosecution does not contest that there is no daylight between our case and Rodriguez. But in Rodriguez, that was a finger-pointing case. No, it was. Rodriguez, in this case, is not a finger-pointing case. Actually, Your Honor, Rodriguez itself talks about the subtle nature, if I may, if I just may elaborate. In that case, it was antagonistic defenses as well. In this case, the prosecution, the Perry on Kings theory was that the statement that the initial statement that he makes to police, I didn't see the shooting, consistent with his trial testimony, I didn't see the shooting, is the correct, makes clear that he was just speculating when he says PK and them. And, in fact, the Perry on King objected to that statement. It's brought out, not only multiple times in rebuttal closing argument, but by co-defendant's counsel as a result of the trial court's erroneous refusal to sever. They raised antagonistic defenses prior to trial. Co-defendant's counsel clarified, I am taking the position that the State's evidence is going to connect Perry on King and to this blue car. And, in fact, we are going to, quote, unquote, firm up the evidence to establish that connection. At what point did defense counsel file a motion to sever? He did not. So it's somewhat problematic, is it not? Your Honor, yes. And I will posit that he didn't. That's why we partially couched this issue in ineffective assistance terms. Now, just to go through the record as clearly as I possibly can, pretrial defense counsel for Mr. Lilly files multiple severance motions. And your client never joined in those motions? He did not join until prior to trial on transcript page R-175 prior to jury selection. At that point, trial counsel for Perry on King inartfully says, references a prior severance motion and says that he would like to adopt it. This is very important. The prosecution makes no objection at that time. And the Court says simply, absolutely, it is noted and my ruling will stay the same. Then post-trial, it is contained, the denial of severance is very clearly raised in Perry on's post-trial motion. It is at that point that the prosecutor belatedly decides to object and says there is no pretrial severance claim. And defense counsel does not, defense counsel for Perry on does not say that that's incorrect. He agrees. He says, yes, but when that motion that was filed, there's no indication that he was there. But it's very clear based on R-175 that at least that prior to trial he becomes aware that there was a pretrial severance motion based on antagonistic defenses. And he adopts it, though inartfully. And then at that point he says, and when there is a pretrial suppression hearing, that ruling necessarily, and I think he used the word inures to the defendant, it's necessarily impactful on Perry on. And so we would say that it was raised before, it was an abuse of discretion, whether you look at it in terms of co-defendant Lilly or defendant Perry on King, who I represent. And that is because very clearly the trial court or the motions set out antagonistic defenses and they clarified that these two defendants would take different positions. And, in fact, that's exactly what happened at trial. I see that my time is running short. Would you like me to just wrap up? You have no further questions. You will have an opportunity for rebuttal. Thank you very much. Excuse me. Okay. I would direct this Court to the pages in our briefs where we do discuss my opening brief in quite detail, how it's the PK in them is repeated, how actually the co-defendant's counsel tries to point out to rehabilitate Tyrone and his prior identification. Thank you very much for all those reasons we ask that you reverse and remand for a new trial. Thank you. Thank you. Good morning, Your Honors. First, I'd like to respectfully request that you reconsider your decision to request that I take my mask off. I did want to let you know I have COVID in my house, and for everyone's protection, I would appreciate that. If you can't hear me at any time, please let me know and I will pull this down or get closer. Please take your time. Speak slowly. It's easier to understand you when you speak a little slower with the mask on. Okay. If necessary, we'll give you a few extra minutes. I appreciate that, Your Honor. Thank you very much. Good morning, Your Honor. Counsel. May it please the Court. My name is Lynn Harrington, and I represent the people of the State of Illinois. Your Honors, as we all know, this is an extremely tragic case. We have four victims here, but the most sad part about this is Richard Griffin. Richard and his wife, Marsha, were just leaving an early dinner and talking about moving to Florida when the defendant shot his gun, or his co-defendant shot his gun, and caused Richard to become a vegetable for three years, and subsequently Mr. Griffin has passed away. Turning to the issues on appeal, Your Honor, I would like to first start with the motion to sever because I think it's an important one that my opposing counsel brought up first. Tell us, Ms. Harrington, at what point did the defendant, in this case, file or agree to a motion for severance? Yes. Thank you, Justice Shostak. That is very important because the record is quite clear that Mr. King's counsel never filed a motion, never asked to be joined into Edmund Lilly's motion, and at the hearing on the motion to sever, that counsel for King wasn't even present, and the record reflects it. At that hearing, the trial court denied the motion to sever. So is that forfeited here? It's waived, Your Honor, because there's nothing for this court to review because you can't The trial court never had an opportunity to address it. Exactly. So would that be an argument better brought through post-conviction or 214-01? Post-conviction, Your Honor, but it clearly, as I will point out, too, there's no ineffective assistance because the defendant would have been prejudiced by this, this motion to sever. I'm sorry. The defendant would not have been prejudiced or the defendant was not prejudiced assuming that he was part of this motion to sever because of the fact that if you look, there were no antagonistic defenses. Edmund Lilly wanted this motion to sever because he couldn't get far enough away from Perrion King because he knew that there's a mountain of evidence connecting Perrion King to Perrion King's car. The only thing Edmund Lilly had was McGuire, Arlen Foss's friend, family friend, who did say that P.K. and Edmund Lilly were in the same car about an hour before the shooting. Did he say P.K. and Edmund Lilly or P.K. and now? No, this is not the P.K. and now comment, Your Honor. This is Mr. McGuire. If you remember, he was a heroin addict and he had Arlen Foss bring him to the drug transactions and McGuire later identified defendant in a photo lineup and said that he believed, I believe it was an hour before the shooting, he placed defendant and Edmund Lilly in that car. So the biggest concern for Edmund Lilly was the jury was going to take that one tiny piece of evidence from the heroin addict and say, well, come on, they were both in the car. But with regard to Perrion King, the trial court did a very good job of setting out, hey, people, you haven't said anything here. Edmund Lilly said he had an alibi. Perrion King said he wasn't there. Nobody was pointing the finger at the other person. Turning to the issue of the excited utterance, the P.K. and them comment, I don't believe counsel talked about the fact that it's forfeited. This issue is forfeited. It was not raised in the post-trial motion. So then we look at closely balanced, and boy, this is, we have an avalanche. Well, first of all, we have to determine whether or not there was any error in admitting that. Sure. You're right, Your Honor. If we want to go first through that as an excited utterance, the State is arguing here that this is pretty much black letter excited utterance. We've got the three requirements of excited utterance. We've got the time, which is literally 120 seconds after the shooting. Counsel likes to talk about the fact that it didn't occur during the shooting, which if we use our common sense, Your Honors, how could that possibly occur? Sherry Stobart is pregnant. She slammed down on the bottom of the car. Tyrone Smith is trying to get the heck out of Dodge because these people are shooting at him. We've got that testimony of Tyrone is backed up by Mr. McCarty, who's in the building watching this whole thing occur, seeing the Red Pathfinder totally back up and hit the Whitman Bridge to get away from the shooter, Perrion King, in the blue Mazda. I'm sorry. Did I mishear? My time did not go off yet, did it? Okay. Sorry. For that reason, Your Honor, there was no error in allowing in the excited utterance of PK and them. I'd like to address the beyond a reasonable doubt, because we have the defendant here would like, it seems, the standard to be the light most favorable to the defendant. Unfortunately, that's not the proper standard. It's in the light most favorable to the prosecution. We have Sherry Stobart testifying that she recognized the Mazda, that she knew it was Perrion King's, that she saw Perrion King in that Mazda a few weeks before. We've got Tyrone Smith saying that he knew it was Perrion King's Mazda. Sherry also testifies that at least she saw the license plate that began with the letter Q. We've got Detective Gibbons testifying that the VIN number of the burned-out Mazda was found in the impoundment lots. We've got Luther Thomas saying that he saw the picture on the news of the car and that it matched his car. How is that not hearsay? I'm sorry. How is that not hearsay? What he saw, he talked about the license plate on the news compared to the license plate number he took down. How is that not hearsay? I believe it would be for courts of conduct, Your Honor. It was explaining why he, what happened and why he reached out to other people about this, the Mazda, the burned-out Mazda. The state argues in its brief that there's a reasonable inference that when the officer found the VIN, it connected it to the defendant. But I don't understand that. If, in fact, Luther never transferred title, how would it connect to the defendant? Well, first, Your Honor, as we know, the jury is allowed to assess the credibility of the witnesses. And we also know Luther explained that he couldn't transfer title to the defendant because he didn't own it himself yet. No, but I get that. Okay. The question is, the state argues, well, the VIN must, the state suggests that the VIN would have, must have connected to the defendant. But how would that be if Luther's telling the truth and he never transferred title? Because we have the testimony from Luther, Your Honor, that this was his, quote, unquote, nephew, and that he  And the state argues that the VIN would have never connected to the defendant. I get that. But the VIN's never going to connect to the defendant. Oh. Well, we have the testimony. Okay. I'm sorry. We have the testimony of Detective Gibbons that they found the VIN. Then we have the testimony of Luther Thomas that the police called him. So it's a reasonable inference, Your Honor, that once they found the VIN, they went to the Secretary of State, they connected it to Luther Thomas, and the police picked up the phone and said, hey, is this your car? So that's a reasonable inference for the prosecutor to have made. So that's the inference? Yes. Okay. Yes, Your Honor. Ms. Barrington, I know you're talking about all this cumulative evidence and your time is running out, so I wanted you to address the prosecutorial misconduct that the defense alleges in their briefs. Absolutely, Justice Shostak. First, there was no prosecutorial error whatsoever, and my opposing counsel has conceded that this issue was also forfeited. However, let's look at the three comments that the prosecutor made that the defense complains of. The first one is when the prosecutor says Luther told, said the Mazda had been burned, and he said, well, it had some evidence in it. That's also a reasonable inference, I believe, as Justice Shostak mentioned in opposing counsel's argument. So there's nothing wrong with saying it had some evidence in it. How about using this is the same car used in the drug body? As prosecutorial error? Yeah. Can you elaborate on that? I had to burn it? Oh, the only way the police reached out to Luther was from the VIN number? Is that your question? No, there was some testimony, was there not, about that this was the same car that was used in the drug body? Oh, Your Honor, there's a lot of evidence with regard to the drug body. We've got Arlen Foss, who was very smart enough to know that something was, even though he also knew it was drugs, of course something bad was going down. But we have Arlen Foss taking a text and sending it to himself, not one but two days in a row, with regard to that. So we have plenty of evidence connecting Perryon King to these drug buys. We've got McGuire even talking about it, Arlen Foss talking about it. So that, I'll go back if you would like me to, the prosecutorial alleged error. Okay, the third one is the defendant's comment that I had to burn it. Defense objects, prosecutor immediately changes it and says the car was burned. There's really a distinction, there's no difference here with those two comments. So there's absolutely no error. And then the second one is the one that Justice Brennan brought up about the VIN number, and we know that you can make a reasonable inference based on the evidence presented at trial that, of course the police reached out to Luther because they found the VIN, which Detective Gibbons testified to, and we can make a reasonable inference. And the next step would be contacting the Secretary of State, finding out the legal owner of the car, Luther Thomas, and then contacting him. If the panel has no more questions, I can conclude or I can discuss a proportion of penalties, whatever you would like. The penalties. Okay. I think you conceded that there was some error there. Was this case, we have another case. That's okay. Was there an add-on error in this case? Oh, yes. Yes, there was a proportion of penalties, Your Honor, but yes. With regard to the add-on, the State did concede that under the three sections there, we could not prove that there was that the defendant proximately caused the injury because we know there was somebody in the passenger seat also shooting. However, Your Honor, under Supreme Court rule B-4, I apologize, you have the power to vacate and lessen that sentence, and the State would ask that you do so. With regard to proportion of penalties, again, this argument was forfeited, but even in addressing the error or alleged error, which there is none, our Supreme Court has said in Peeble v. Harris that you can't, unless that issue was prepared, addressed below, this Court has nothing to review. There's nothing to review with regard to proportion of penalties. It wasn't raised. Therefore, it's forfeited. The limitation on penalties is the sentence must be determined according to the seriousness of offense. As I have stated, this is a tragic case, absolutely tragic. Richard Griffin lost his life and was a vegetable for three years before that because of Perrion King. His wife tried to visit every single day, but eventually said she couldn't because she had post-traumatic stress disorder from going through all this. The trial court did a wonderful job of setting this all out in sentencing. She found no mitigating factors. And also with regard to, I believe counsel brought up in her brief that the trial court mentioned a 2016 aggravated battery. But if you look at the PSI, it is in the record that he was convicted of aggravated battery in 2016, and I think he was sentenced to three years in the Department of Corrections. So there was absolutely no error there whatsoever, Your Honors. For that reason, the state respectfully requests that this court affirm the four counts of attempted murder in Perrion King's case. Thank you. Additional questions? No. Any additional questions? Thank you. Thank you. Very briefly, Your Honors. With severance, I think I've touched upon the record itself, so I won't go back there. But Justice Shostak, you asked about why not resolving this on PC. We would posit that the ineffective – that if you find that defense counsel did not properly preserve this error, the record sufficiently is fleshed out, that antagonistic defenses were fleshed out. That defense counsel knew this, which is why he tries to adopt it prior to trial. He includes it in his motion for new trial. So, therefore, it would be unreasonable and not sound strategy, not if his failure resulted in the forfeiture of the severance claim. Let me look at the record closer. But did he raise it for the first time in post-trial motions, or are you saying he asked for severance prior to filing the post-trial motion? He did file it, yes. So prior to trial, and I can repeat what he says, quote, we did file motions for severance and were just, again, standing on those motions that the Court should have severed the cases just to preserve it. There is no objection. The Court says something about we'll address that later? Yeah. Actually, her response was there's no objection from the prosecutor. Quote, absolutely. And, of course, the Court's prior ruling will remain in place, leaving counsel to believe his client's claim had been preserved. Counsel, you just said. He's not filing it. He's adopting it, right? Well, that's my question. Correct. Did he file it? You just said or read where we previously filed. Yes. What did he file, and why is it not in the record? He did not file anything prior to the record. So counsel misspoke at the time? I think so. Because, and I'll explain, because if we get to the motion for new trial, then he clarifies very clearly. The prosecutor then objects. At that time, he says, and I have that also, actually. I quoted that as well. That basically, I just want to double check. I want to make sure that I have the quote, if you don't mind. Oh, here it is. Okay. There you go. So at that time, he goes, first, I'd like to set the record straight. People v. Perrion King, there was no motion to sever. The severance was in the related case filed by Nick Zimmerman from the public defender's office, Mr. Lilly's counsel. Then counsel does not contradict this representation. Instead, he responds, when you go to the motion for severance, obviously, this is a case that was joined. There was a motion to sever that was filed. It was denied by the Court. That decision inures to the defendant. So to the extent that defense counsel did not properly flesh this out by filing a ---- there's no case on record that says a defense counsel has to file a pretrial motion to sever and can't just adopt one that's later filed, that was earlier filed by a defense counsel. The State has cited no case. But he did present no evidence on it. He didn't file anything to articulate, here's Mr. Lilly's arguments, but here would be my arguments. That's nowhere in the record. Actually, actually. The defense counsel is not going to solve that, correct? No, Your Honor. Actually, in the record, Edmund Lilly, he said, I'm not representing Perrion King, but just so you know, we are going to be representing antagonistic defenses. And my position, our position, Lilly's position, will be that the evidence definitively links Perrion King to the car and not Edmund Lilly. And I am going to be firming up the evidence wherever the prosecution drops the ball, so to speak. And in fact, he fleshes out the prior relationship that Sherry had with Perrion King by relating an incident two weeks earlier, which was not discussed on direct examination, gets Sherry to admit that the car was not just a blue car, but was very specifically a Mazda crossover. That had not been brought out. So that's with respect to that. He highlights the PK and them, which we would posit even given the short time frame is simply not trustworthy enough to be admissible as an excited utterance. May I finish the answer, if I may? And then there's other evidence that comes in with respect to Tyrone. And this is the most critical. He gets, codefendant gets Tyrone to admit that, no, I was never shaky on my identifications, but that directly undercuts Perrion King's counsel's position. But there was a lot of other testimony, cumulative testimony with respect to the ID. Tyrone didn't. It was at the nail in the coffin. It actually is. And I think this is where Rodriguez is very important. We don't have an identification. We have Tyrone on the stand saying, I didn't see the shooter's race. This PK and them, which is more like a speculation based on his prior relationship with Perrion King, it's not done spontaneously. It's done after the fact. He's got a motive to lie. He was involved in this offense. He's, according to his own girlfriend, there's not cumulative. I know the state wants you to think that there's overwhelming evidence of guilt. There may be overwhelming evidence that this was a terrible crime. There is not overwhelming evidence of guilt that Mr. King is responsible for that offense. We have gap after gap after gap. They don't introduce the VIN or the license plate of Mr. Luther's car. They want to backdoor this evidence by bringing in substantively, without a limiting instruction, improper course of conduct evidence. They want also to bring in an untrustworthy statement, PK and them, repeatedly. And that's what Rodriguez brilliantly said, if I may, is the error. It's not just the prosecution and defense counsel. It's prosecution, co-defendant's attorney against defendant. That very two-in-one, by its nature, is highly problematic. Well, what about the defendant burning his own car? That we would. One assumes it wasn't because he didn't like the car. There's no evidence that that was even his car. Well, there's plenty of evidence that that was the car he was regularly driving. You're not discounting that that was the car he regularly drove. According to Luther Thomas, who himself has many problems, not least of all, which is the fact that he's implicated in this offense by virtue of owning that car. And he says himself, he makes a candid admission that, yeah, I was concerned I would be implicated in this offense. And then on top of that, we have him not being forthcoming about this statement about, like, the burning. He doesn't bring it up initially. Initially, he says, he said, Perrion told me that it was stolen. All right. Then he goes. The testimony continues and continues. I mean, the jury was left to grapple with, are these witnesses being coached? That's their job, though. The jury's job is to make a determination whether witnesses are telling the truth, correct? Absolutely. But that it's a reviewing court's duty to review to make sure that those inferences were reasonable. And a reviewing court's job, Your Honor, is to make those reasonable inferences when they favor the defendant. In this case, where we have this many gaps between the three or four cars that the prosecution wants to link together, the inference is that defendant, that it wasn't defendant's car, or like Edmund Lilly, he wasn't in that car at the time of the shooting. Even Luther Thomas says, look, he primarily had that car. And, Your Honor, Justice Brennan, he wavered when asked to make an identification from the photographic exhibit. Is this your car? And he's like, yeah, I don't know. We've got all these problems. So while it's a tragic event, the evidence simply doesn't, isn't sufficient, whether you look at it for reversible error or reversal and remand for new trial. Would you like me to touch upon the proportion of penalties or? Yeah. Okay. Thank you, Your Honors. I appreciate that. Well, thank you both for extraordinary arguments this morning. We will issue a decision in due time, and we are adjourned.